UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  09-cv-00770-WYD

MICHAEL G. RODMAN,

     Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of the Social Security Administration,

     Defendant.

---

**ORDER**

---

THIS MATTER is before the Court on review of the Commissioner's decision that denied Plaintiff's claim for disability insurance benefits and supplemental security income under the Social Security Act.  For the reasons stated below, this case is reversed and remanded to the Commissioner for further fact finding.

I.    <u>BACKGROUND</u>

Plaintiff was born in 1963.  (Transcript ["Tr."] 46.)  He completed two years of college and worked in the past as an HVAC technician.  (*Id.* 63, 67, 74.)  Plaintiff alleges that he became disabled on July 3, 2005, when he was 41 years old, because of acute gout, a heart condition, and depression.  (*Id.* 62-63.)   In more recent years, Plaintiff asserts that his condition is further complicated by "severe" to "morbid" obesity (*id.* 271) and chronic pulmonary hypertension resulting in pulmonary symptoms and the need for daytime oxygen.  (Pl.'s Opening Brief at 3.)

Plaintiff filed his initial applications for benefits in December 2005 (Tr. 46-50, 294-97), which were denied. (*Id.* 40, 42-45.) Plaintiff requested a hearing before an administrative law judge ("ALJ"), which was held on January 15, 2008. (*Id.* 300-31.) On March 5, 2008, the ALJ issued a decision denying Plaintiff's claim. (*Id.* 14-33.)

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (Tr. 19.) At steps two and three, the ALJ found that Plaintiff had severe impairments (coronary artery disease, gout, obesity, and depression), but that they did not meet or equal the requirements of the Listings. (*Id.* 19-20). The ALJ then found that Plaintiff had the residual functional capacity ["RFC"]:

> to occasionally lift 20 pounds and frequently lift 10 pounds; to sit 2 hours per occasion for a total of at least 6 hours in an 8 hour work day with the opportunity to briefly stand and stretch in the work area each hour; and to stand and walk 10 minutes each per occasion, up to a total of 2 hours in an 8 hour work days. He is unable to use foot controls. He requires regular breaks at approximately 2 hour intervals. He requires oxygen. He cannot climb ladders or scaffolds. . . .He can: *occasionally* climb ramps and stairs, balance, stoop, kneel, crouch, be exposed to extreme cold, wetness, humidity, be exposed to fumes, odors, and other pulmonary irritants. He can frequently reach, handle, finger, and feel bilaterally. He has the ability to understand, remember, and carry out those types of work instructions that can be learned in 30 to 60 days. He can have only occasional work interaction with the general public, supervisors, and co-workers.

(*Id.* 21) (emphasis in original.)

Based on the RFC and a vocational expert's testimony, the ALJ found at step four that Plaintiff could not return to his past work. (Tr. 21.) At step five, the ALJ found that Plaintiff was not disabled because a significant number of jobs exist in the national economy that he could perform. (*Id.* 32-33.)

-2-

The Appeals Council denied Plaintiff's request for review (Tr. 7-10), making this the final agency decision. (*Id.* 1-3). Plaintiff timely requested judicial review.

Plaintiff argues that the ALJ failed to properly consider his combination of impairments, including obesity; that his condition meets or equals a listed impairment; that the ALJ failed to properly evaluate the treating physician opinions; and that the ALJ failed to develop the record as to certain limitations. Plaintiff also asserts that the hypothetical question did not include all of Plaintiff's limitations, that the credibility analysis was flawed, and that the ALJ erred at step five of the sequential evaluation.

The Commissioner argues in response that the record as a whole, including the fact that Plaintiff's conditions were well-controlled when he was actually taking his medications, provides substantial evidence supporting the ALJ's decision. It is further argued that the ALJ's highly restrictive RFC assessment accounts for Plaintiff's credible limitations. Finally, it is argued that the vocational expert's testimony supports a conclusion that Plaintiff was capable of performing work that exists in significant numbers in the national economy. Accordingly, the Commissioner maintains that substantial evidence supports the ALJ's determination that Plaintiff is not disabled.

II.     ANALYSIS

A.     Standard of Review

A Court's review of the determination that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standard and whether the decision is supported by substantial evidence. *Hamilton v. Sec'y of Health and Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is

evidence a reasonable mind would accept as adequate to support a conclusion.  *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990).  "It requires more than a scintilla of evidence but less than a preponderance of the evidence."  *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988).

"Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Also, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from substantial evidence."  *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

B.  Analysis of Plaintiff's Arguments

1.  Whether the ALJ Properly Considered the Combination of Plaintiff's Impairments

Plaintiff first argues that the ALJ erred by not properly considering the combination of his impairments, Including obesity.  I agree.  The law is clear that when a claimant has one or more severe impairments, the Social Security Act requires the Commissioner to consider the combined effects of the impairments in making a disability determination.  *Campbell v. Bowen*, 822 F.2d 1518, (10th Cir. 1987) (citing 42 U.S.C. § 423(d)(2)(C)).  Further, when "determining a claimant's residual functional capacity, the ALJ must consider all of a claimant's impairments, whether or not they are 'severe.'"  *Wall v. Astrue*, 561 F.3d 1048, 1065 (10th Cir. 2009).

I first address the issue of obesity.  The ALJ found obesity to be one of the severe impairments in this case (Tr. 19) and stated in connection with his step three

analysis that "obesity has been considered in this decision." (*Id.* 20).  He also quoted

doctors' statements and medical records that note obesity or its impact on functional

limitations.  However, the ALJ never actually discussed or explained what impact, if any,

obesity has on Plaintiff's other impairments.  The ALJ also did not discuss the impact of

Plaintiff's obesity on his ability to work.  Instead, the bulk of the analysis by the ALJ as

to whether or not to accept Plaintiff's testimony and the opinions of the treating

physician had to do with an analysis of Plaintiff's gout attacks.  This is error, as the

effects of obesity must be properly considered and evaluated when evaluating disability.

SSR 02-1p, 2000 WL 628049, at *1 (Sep. 12, 2002); *see also DeWitt v. Astrue*, No. 09-

3250, 2010 WL 2181759, at *2 (10th Cir. June 2, 2010).

As discussed in the regulations, "the combined effects of obesity with other

impairments can be greater than the effects of each of the impairments considered

separately", and adjudicators [must] consider the effects of obesity not only under the

listings but also when assessing a claim at other steps of the sequential evaluation

process, including when assessing an individual's residual functional capacity."  SSR

02-1p, 2000 WL 628049, at *1.  An ALJ may "'not make assumptions about the severity

or functional effects of obesity combined with other impairments,' but rather, must

'evaluate each case based on the information in the case record.'"  *DeWitt*, 2010 WL

2181759, at *2 (quoting SSR 02-1p, 2000 WL 628049, at *1.)  Obesity by itself can be

the sole medically determinable impairment causing disability or it may also be a co-

factor along with other impairments.  SSR 02-1p, 2000 WL 628049, at *4.

Obesity "increases an individual's chances of developing impairments in most body systems and "commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems." SSR 02-1p, 2000 WL 628049, at *3. "Obesity may also cause or contribute to mental impairments such as depression." *Id.* Further, it can cause limitations of exertional and other functions that impact the ability to work, including the ability to function over time. *Id.* at *6.

While the Commissioner argues that I should "take the ALJ at his word when he said that he considered Plaintiff's obesity" (Defendant's Response Brief at 18), this is inappropriate. That is because the ALJ is required to explain in his decision how he reached his conclusions on whether obesity caused any physical or mental limitations and whether it impacted the functional limitations caused by Plaintiff's other severe impairments. SSR 02-1p, 2000 WL 628049, at *7; *DeWitt*, 2010 WL 2181759, at *3; *Baker v. Barnhart*, No. 03-7041, 2003 WL 22905238, at *3 (10th Cir. Dec. 10, 2003). Since the ALJ's decision fails to indicate adequate consideration of Plaintiff's obesity in relation to his other impairments, this case must be remanded to ensure compliance with SSR 02-1p. *DeWitt*, 2010 WL 2181759, at *4; *see also Hamby v. Astrue*, 07-5051, 2008 WL 63485, at *3-4 (10th Cir. Jan. 7, 2008).

Further, obesity must be considered at all steps of the sequential evaluation, which the ALJ did not appear to do here. *Baker*, 2003 WL 22905238, at *3. The ALJ also must assess "the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment", as required.

-6-

*Id.* Further, the ALJ must consider the effect obesity has on Plaintiff's "exertional, postural, and social functions." *Id.*

A remand is also appropriate because the ALJ does not discuss the impact of fatigue on maintaining attention at a job and working full time. This is error, since the record is replete with references to fatigue as well as sleep apnea. (Tr. 271). As noted in SSR 02-1p, in "cases involving obesity, fatigue may affect the individual's physical and mental abilities to sustain work activity. This may be particularly true in cases involving sleep apnea." *Id.,* 2000 WL 628049, at *6. Sleep apnea associated with obesity "can lead to drowsiness and lack of mental clarity during the day". *Id.* The Tenth Circuit has held that even without obesity, the effects of fatigue must be considered. *Clark v. Barnhart*, No. 02-5093, 2003 WL 1909289, at *2-4 (10th Cir. April 22, 2003) (the ALJ errs when he fails to consider allegations of fatigue and case reversed and remanded on this issue) (citing *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) (remanding where ALJ ignored claimant's allegations of severe fatigue which her condition would reasonably be expected to produce)).

I also find that the ALJ failed to consider the combination of Plaintiff's other impairments, including those that the ALJ may have found not to be severe. In her letters of August 30 and November 8, 2007 (Tr. 195, 267), Dr. Ashe sets forth the combination of all impairments that were affecting Plaintiff. I find in the next section that the ALJ failed to properly weigh Dr. Ashe's opinions. She notes in her November 2007 letter, "gout flareups are treated with Prednisone, which has caused significant weight gain (at least 50 pounds in the year 5/06 to 5/07). The additional weight in turn triggers

additional gout attacks when Mr. Rodman stands or walks for extended periods of time (over one hour)." (*Id.* at 267.)  She also discusses his coronary artery disease and states that Plaintiff is on oxygen at least at night.  These conditions certainly cause fatigue, as evidenced in the record, as well as impact Plaintiff's ability to work.

Indeed, the evidence from Dr. Ashe supports a finding that Plaintiff's combined impairments cause not only fatigue, but lack of concentration and inability to maintain a production pace, to handle routine changes in a work environment, and to sustain work activities.  There is also evidence of Plaintiff's inability to stand for over an hour of time in an 8 hour day, impacts of gouty flairs that Plaintiff may experience, including the need to miss work, the need to use a wheelchair on bad days, the impact of Plaintiff's mental impairments, and the fact that Plaintiff has an enlarged heart with non-flow limiting stenosis of heart arteries and a finding of ischemia, which requires the use of oxygen. While the ALJ acknowledged the need for use of oxygen, he did not discuss how that, or the pulmonary problems, affected Plaintiff's ability to work at a production pace or how it might affect his ability to carry.  In short, the combination of Plaintiff's impairments were not properly considered by the ALJ.[1]  A remand of this case is appropriate so that the ALJ can adequately address the combined affect of all impairments supported by the record on remand.

---

[1]  At the hearing the ALJ improperly cut the Plaintiff off when he tried to describe to the ALJ how the combination of his impairments impacted his ability to work.  The ALJ asked Plaintiff to tell him "what most gets in the way of your ability to work on a regular sustained basis. . ." (Tr. 311.)  Plaintiff stated, "My health problems are kind of intermingled due to arthritis and gout and cardiac problems. When my arthritis . . . ." (*Id.*)  He was then interrupted by the ALJ who stated, "I'm not asking you for, just to start talking.  I'm asking you what you feel were the primary problems that got in the way of your ability to work on a regular basis?" (*Id.*)  This was error, and is an example of how the ALJ failed to properly consider the combination of impairments.  Plaintiff should be allowed to fully explain this issue on remand.

I also find that the ALJ did not conduct a proper pain analysis which must be addressed on remand.  The ALJ found that while Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms; . . . the claimant's symptoms are not credible to the extent they are inconsistent with the" RFC.  (Tr. 29.)  Thus, the ALJ did not include pain in the hypothetical question, determine what impact Plaintiff's pain may have on his ability to work, or address many of the required factors in the pain analysis.  This is error.  The medical records uniformly document Plaintiff's pain, no provider appeared to discount the pain complained of by Plaintiff, and Plaintiff was prescribed medications to assist with the pain, including a "high risk" medication.  (*Id.* 211.)  Further, treating physician Dr. Ashe opined that Plaintiff would miss more than two days per month of work because of pain and/or fatigue.  (*Id.* 191.)  There was no evidence to the contrary in the record.

While the ALJ believed that Plaintiff's gout improved with treatment, this does not mean that Plaintiff's other conditions were not causing pain and fatigue.  Diagnostic studies support many causes of the pain, not just gout.  An x-ray of July 13, 2006 showed an indication not only of gout but also "ankylosing spondylitis with elbow, knee and pelvic pain".  (Tr. 228, 230-31.)  The results of the view of the left knee showed some degenerative changes.  (*Id.* 231.)  The record from University Hospital on that date discussing a "review of systems" states, "chronic joint pain.  Patient has chest pains which are at rest as well as exertion." (*Id.* 233.)  The records of a medical visit on June 16, 2006 state that "we will also check x-rays of his hands, feet and hips to look for erosive changes.  Patient's rest of history is consistent with gout, but him having attacks

in hips is quite unusual.  Might be having hips osteoarthritis, it is more likely." (*Id.* 234.)

Dr. Striebich's found that the x-rays of the hips of July 13, 2006 show "some

degenerative changes."  He also confirmed the degenerative changes in the foot and a

spur on the foot.  (*Id.* 227, x-ray results at 228-229.)  Dr. Ashe noted that while on

previous occasions [Dr. Striebich] said patient's [complaints] were not gout related at

times. . .they are nonetheless joint pains. . . ." (*Id.* 207.)  Finally, the record notes

"abnormal movement of all extremities" and deformities of Plaintiff's fingers.  (*Id.* 280.)

Further, Plaintiff testified to arthritis as well as gout in his elbows and hands, and

about having a hard time holding things because of the osteoarthritis in his hands.  (Tr.

311, 314-15.)  He talked about pain in his lower body, feet, knees, ankles, and hips.  (*Id.*

311.)  Plaintiff also discussed that when the pain is bad with his gout and arthritis it

causes problems with his heart.  (*Id.* 314.)  In talking about his heart, he stated, "It

makes me really tired.  I have a hard time doing a lot of things because of the problem

and also with the problem of the steroids they put me on.  The steroids have caused me

to gain 150 pounds plus the respiratory problems that the steroids have caused.". (*Id.*

314.)  He used a wheelchair at times, including the hearing.  He testified to having to lay

down during the day.  (*Id.* 316.)  He also talked about anxiety and the side effects of

Zoloft, that "it also brings me up and it has a crashing effect.  It also makes me kind of

sleepy." (*Id.* 318.)  Further, he testified to concentration problems from the medication.

(*Id.* 322.)  The ALJ did not properly consider these factors.

Based on the foregoing, it was error for the ALJ to simply discount Plaintiff's

complaints of pain and Dr. Ashe's opinions regarding pain and fatigue.  It was also error

for the ALJ to not properly consider the medications Plaintiff was taking, the alleged side effects from same, and the other factors required in a pain analysis.  *See Carpenter v. Astrue*, 537 F.3d 1264, 1268 (10th Cir. 2008) (the ALJ erred in not explaining how plaintiff's repeated attempts to find relief from pain, and all the drugs she has been prescribed for pain, resulted in a conclusion that she is unlimited in any regard by pain); *Romero v. Astrue*, No. 06-6305, 2007 WL 2110899, at *2 (10th Cir. July 24, 2007) (doctor's conclusions concerning Ms. Romero's pain and limitation "find support in the treatment records and therefore could not be cursorily dismissed for the reason the ALJ gave: lack of medical evidence").

Finally, "[i]f the ALJ finds that plaintiff's pain, by itself, is not disabling, that is not the end of the inquiry."  *Harrison v. Shalala*, No. 93-5238, 1994 WL 266742, at *5 (10th Cir. June 17, 1994).  "The [Commissioner] must show that 'jobs exist in the national economy that the claimant may perform *given the level of pain [he] suffers*.'"  *Id.* (emphasis in original) (quoting *Thompson*, 987 F.2d at 1490-91) (further quotations omitted).  A vocational expert "is ordinarily required to determine what limitation . . . pain might impose on [Plaintiff's] ability to do. . . work."  *Id.*

2.   The ALJ's Weighing of Treating Physician Dr. Ashe's Opinions and the Medical Evidence

Plaintiff also argues that the ALJ failed to follow the applicable regulations and rulings in evaluating the opinions of Dr. Ashe.  He asserts that the ALJ did not make findings as to whether or not Dr. Ashe's opinions as to physical limitations were well supported and whether or not they were contradicted.  Further, Plaintiff argues that the

ALJ improperly rejected Dr. Ashe's opinions as to Plaintiff's mental limitations.  Thus, Plaintiff asserts that the ALJ did not apply the correct legal standard and his findings are not supported by substantial evidence.  Again, I agree with Plaintiff and find that a remand is appropriate on this issue as well.

An ALJ is "required to give controlling weight to a treating physician's opinion about the nature and severity of a claimant's impairments, including symptoms, diagnosis and prognosis, and any physical or mental restrictions, if 'it is well supported by clinical and laboratory diagnostic techniques and if it is not inconsistent with other substantial evidence in the record.'"  *Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995) (quotation omitted).  A treating physician's opinion must be given substantial weight unless good cause is shown to disregard it."  *Goatcher v. United States Dep't of Health and Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1994).  The ALJ must give specific, legitimate reasons for disregarding a treating physician's opinion.  *Id.*

Dr. Ashe reported on September 5, 2006 from a physical perspective that Plaintiff suffered from severe gout with numerous attacks and has been "on chronic Prednisone, with resultive massive weight gain of close to 100 pounds."  (Tr. 190).  She discussed Plaintiff's reports of increased fatigue with daily activities and stated "he is presently unable to tolerate a routine shopping trip to the grocery store, requiring assistance from a motorized cart".  (*Id.*)  Dr. Ashe also discussed the fact that more investigation needs to be done into the sleep apnea and pulmonary consequences of Plaintiff's obesity and states "his obesity is also responsible for muscular skeletal complaints unrelated to gout, such as back pain and tendinitis."  (*Id.*)  Dr. Ashe concludes "in short, in my

opinion, Mr. Rodman's gout, depression and coronary artery disease make it hard for him to pursue gainful employment, although work that involves sitting down all day is possible, it would need to be flexible enough to accommodate flare-ups of the above conditions, which occur every few days.  His prognosis is guarded." (*Id.*)

On April; 26, 2007, Dr. Ashe opined that Plaintiff would have limitations including the need to lie down periodically during the day, sitting for only 2 hours in an 8 hour day, that Plaintiff would miss more than 2 days per month because of pain and/or fatigue and would be limited to using his hands only frequently.  He could stand or walk (combined) for less than 1 hour at a time and sit a maximum of 2 hours in an 8 hour day.  (Tr. 191.)

In a Functional Capacity Evaluation (Mental) completed in April 2007, Dr. Ashe indicated there would be a moderate limitation on Plaintiff's ability to understand and remember very short and simple instructions, and a marked limitation on remembering detailed instructions.  There would be an extreme limitation on his abilities to maintain attention and concentration for extended periods of time and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. There were also marked limitations in Plaintiff's ability to travel to unfamiliar places or use public transportation.  Further, Plaintiff could not make judgments commensurate with the functions of unskilled work or simple work related decisions.  (Tr. 193-194.)

The ALJ rejected or appeared to reject Dr. Ashe's opinions in their entirety. Specifically, as to Dr. Ashe's opinions regarding Plaintiff's physical impairments, the ALJ stated "the opinions of Dr. Ashe are given little weight in the assessment of residual functional capacity but are given greater weight as to the frequency of visit and

notations of claimant's complaints." (Tr. 31.)  The ALJ gave the opinions in the mental

Functional Capacity Evaluation "no weight".

While the ALJ stated that he gave "little weight" to Dr. Ashe's assessment of

Plaintiff's physical impairments, it appears that he actually gave these opinions no

weight.  This should have been clear in the record, so the Court could determine what

weight the ALJ actually assessed this opinion.  *Watkins v. Barnhart*, 350 F.3d 1297,

1301 (10th Cir. 2003); *see also* SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (the

ALJ's decision must be sufficiently specific to make clear to any subsequent reviewer

the weight that was given to a medical opinion).

Second, the ALJ erred as he conducted no analysis of whether Dr. Ashe's

opinions (regarding both mental and physical impairments) should be given controlling

weight, *i.e.*, whether they were well supported and consistent with other substantial

evidence.   An ALJ errs when he fails to show that he conducted a proper analysis of

this issue. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).  While the

Commissioner now argues that the ALJ could reject Dr. Ashe's opinions regarding

Plaintiff's RFC because they were inconsistent with other evidence, my review is limited

to the ALJ's findings in his decision.  Thus, this and other post hoc arguments made by

the Commissioner in his Response are improper.  *See Carpenter*, 537 F.3d at 1267 ("a

post hoc rationale is improper because it usurps the agency's function of weighing and

balancing the evidence in the first instance . . . .Judicial review is limited to the reasons

stated in the ALJ's decision").  Further, as discussed below, I do not think that this

argument is even accurate.

Third, even if an ALJ decides that a treating physician's opinions are not entitled to controlling weight, this does not allow him to reject their opinions outright. *Langley v. Barnhart*, 373 F.3d 1116, 1120 (10th Cir. 2004). Instead, the physician's opinions are "'still entitled to deference and must be weighed using all of the [relevant] factors.'" *Id.* (quotation omitted).[2] "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996).

The ALJ did not appear to give any deference to Dr. Ashe's opinions, weigh the relevant factors, or consider for the record what lesser weight should be given to her opinions. He also appeared to violate the rule that when a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports 'to see if [they] outweigh[] the treating physician's report, not the other way around.'" *Goatcher*, 52 F.3d at 290 (quotation and internal quotation marks omitted). The ALJ's failure to apply the correct legal standards or to provide the court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal. *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).

I now turn to the reasons given by the ALJ for rejecting Dr. Ashe's opinions. In giving "little weight" to her opinions regarding Plaintiff's physical impairments, the ALJ stated that "Dr. Ashe's records provide no mention of the claimant's inconsistency in his prescribed medications" and that her "records and opinions . . . do no reflect the improvement the claimant has had in his symptoms since following the prescribed

---

[2]  These factors are set out in 20 C.F.R. § 404.1527(d).

treatment of Dr. Striebich." (*Id.*)  I find that these reasons are not sufficient to simply disregard Dr. Ashe's opinions as a treating physician.  First, they are not reasons to reject Dr. Ashe's opinions as controlling.  *See Bean*, 77 F.3d at 1214.  Second, I find that these are not valid reasons to reject Dr. Ashe's opinions.

I first address the ALJ's finding that Dr. Ashe's records provide no mention of Plaintiff's inconsistency in his prescribed medications.  (Tr. 31.)  Related to this, the ALJ also found that Plaintiff was not fully credible regarding his symptoms on the basis that he "has gone for long periods without bothering to obtain or refill prescribed medications, which suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application."  (*Id.* 30.)  The ALJ committed legal error as to this finding and failed to conduct a proper analysis of the issue.

The failure to follow prescribed treatment, including taking medication, is not a basis to decline to give controlling weight to a treating physician's opinions and constitutes an improper lay opinion of the ALJ.  The Tenth Circuit is clear that "'[i]n choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion.'"  *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (quotation and emphasis omitted).

The *Robinson* court found that the ALJ erred in rejecting the treating physician's opinion "based on his own speculative lay opinion that claimant failed to comply with prescribed treatment, an improper basis to reject the treating physician's opinion."  *Id.* at

1083.  The same is true here.  While Dr.  Striebich questioned at one time whether

Plaintiff was on certain medication for his gout, Dr. Ashe did not make any findings that

Plaintiff failed to follow prescribed treatment.  Further, it appears that Plaintiff was taking

his medications when Dr. Ashe issued her opinions in April and November 2007.

Also as in *Robinson*, the ALJ's "conclusion is procedurally and legally deficient

because he did not make the findings necessary to deny the claim on the basis of

claimant's noncompliance with prescribed treatment, nor did he give claimant or h[is]

treating physician an opportunity to explain the specific reasons for [the claimant's]

failure to take medications to determine if justifiable cause existed for h[is] failure."

*Robinson*, 366 F.3d at 1083-84.[3]  In other words, the ALJ was not entitled to rely on the

fact that Dr. Ashe failed to refer to this issue in her opinions; instead, he was required

by law to develop the record on this issue.  The ALJ's finding only points out his failure

to comply with the legal requirement to let Dr. Ashe explain this issue.

Also on the issue of medication, Plaintiff denied that he failed to take the

medication as referenced by Dr. Striebich, and there is evidence that Plaintiff had

limited funds, was out of health insurance, and had to apply for entry into the Colorado

Indigent Care Program ["CICP"].[4]  That may have made the purchase of medication

more difficult.  A claimant's inability to afford treatment may constitute justifiable cause

for failing to comply with prescribed treatment.  *Lee v. Barnhart*, No. 03-7025, 2004 WL

---

[3]  The ALJ appeared to be under the mistaken impression that Dr. Ashe was male.

[4]  According to Plaintiff, CICP provides a partial solution to the health care needs of the state's medically indigent citizens and does not provide a comprehensive benefits package.  The program is not an insurance program, but rather a financial vehicle for providers to recoup some of their costs for providing medical services to the medically indigent.  (Pl.'s Opening Brief at 4 n. 2.)

2810224, at *4 (10th Cir. Dec, 8, 2004).  These issues should have been developed and Plaintiff should have been allowed to explain any failure to take medication.  *Robinson*, 366 F.3d at 1083-84; *see also* SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996) ("The adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").

The credibility finding also referenced the fact that Plaintiff did not obtain a primary physician for "a five-eleven month period" when he moved to Colorado.  The ALJ stated that this "suggests that his symptoms may not have been as serious as has been alleged in connection with this application."  (Tr. 30.)  I also find error with this finding.  First, the ALJ selectively applied the evidence on this issue, as during this same period Plaintiff had three emergency room visits that lend support to the severity of complaints.  *See Carpenter*, 537 F.3d at 1265 (the ALJ may not "'pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence'") (quotation omitted).

Second, the ALJ failed to consider the fact that Plaintiff had to apply for and be accepted into CICP before he could see a treating physician.  (*See* Tr. 140.)  That was accomplished by December of 2005 when Plaintiff was seen by Dr. Ashe (under CICP).  (Tr. 152, noting "NP" for "new patient").  Plaintiff's application for benefits shows that the family had only $900.00 per month income from his wife's work at McDonald's and no

-18-

other significant assets.  (*Id.* 294-295.)  Pursuant to SSR 96-7p, the ALJ must consider the fact that the claimant "may be unable to afford treatment and may not have access to free or low-cost medical services."  *Id.*, 1996 WL 374186, at *8.

I now turn to the second reason the ALJ gave to reject Dr. Ashe's opinions regarding Plaintiff's physical impairments—the purported improvement Plaintiff had in his symptoms since following Dr. Striebich's treatment.  The ALJ refers to an exam in October 2006 wherein Plaintiff's serum urate level goal had been reached and, consequently, Dr. Striebich "believe[d] the risk of his flaring" was "extremely low."  (Tr. 30)  Dr. Striebich found that certain of Plaintiff's medications might be discontinued based on his latest lab results.  (*Id.*)  The ALJ continued by analyzing the number of reports of gouty flares reported by Plaintiff and his later representation to Dr. Striebich that he was doing fairly well.  (*Id.* 31.)  The ALJ concluded from this that "contrary to the Claimant's representation of constant pain from gout attacks since 2005, he has been getting consistently better especially since taking his medications consistently."  (*Id.*)  "And he is at extremely low risk of a gouty flare."  (*Id.* 30.)

The ALJ erred, however, in again selectively applying the evidence and ignoring the fact that Plaintiff continued to suffer gout attacks even after Dr. Striebich reported his risk of gout flare-ups was low.  Indeed, in November 2006, one month after Dr. Striebich's report in October 2006, Plaintiff requested a refill of vicodin after having a gout flare-up that lasted three weeks.  (Tr. 207.)  While Dr. Striebich may have felt that Plaintiff should not be having such frequent gout attacks and/or that Plaintiff's flares were not gout related, Dr. Ashe stated in response that the flare-ups nevertheless

-19-

involve joint pains (*id.*), another fact the ALJ conveniently ignored.  Also, a gout flare up

was reported on November 8, 2007.  (*Id.* 274.)  Finally, as late as December 13, 2007, a

treatment note of Dr. Striebich indicates that while Plaintiff stated he was "fairly satisfied

with the frequency of attacks", Plaintiff still had "experienced 3 gout attacks since his

last visit [of 8/16/07]."  (*Id.* 279.)  The diagnosis was "chronic gout" as well as possible

obstructive sleep apnea and taking high risk medication (Prednisone).  (*Id.*)  The pain

level was noted to be 5 out of 10 in "hips and feet" with stiffness.  (*Id.* 280.)

Thus, regardless of the fact that Dr. Striebich felt in October 2006 that Plaintiff's

gout had improved and that he was at a low risk of gout flare-ups, the evidence shows

that Plaintiff continued to suffer from frequent gout flare-ups as well as pain even after

Plaintiff was following Dr. Striebich's prescribed treatment.  The ALJ erred in ignoring or

discounting this important evidence.[5]

More importantly, the ALJ erred by focusing only on Plaintiff's gout and the fact

the ALJ believed it was getting better.  Plaintiff's condition was not, however, limited to

gout.  It was the combination of his impairments that limited his functional capacities, as

discussed previously.  There is no evidence that Dr. Striebich, a rheumatologist, opined

as to the impact of Plaintiff's obesity, coronary artery disease, pulmonary problems, pain

and other problems that impacted his overall condition or ability to work.  (Tr. 195, 267.)

---

[5]   Further, the fact that Mr. Rodman had gout that could cause limitations to the extent he testified
is not disputed.  The ALJ made that specific finding: "After considering the evidence of record, the
undersigned finds that the Claimant's medically determinable impairments could reasonably be expected
to produce the alleged symptoms".  (Tr. 29.)

Indeed, Dr. Ashe appears to be the only doctor that based her opinions on the combination of impairments, a factor that must be adequately weighed on remand.

The Commissioner now argues, however, that Dr. Ashe's opinion in September 2006 was inconsistent with her April 2007 opinion and that this is a basis to affirm the ALJ's decision to give "little weight" to Dr. Ashe's opinions.  Again I do not  agree.  The September 2006 opinion did not attempt to define the length of time that Plaintiff could sit in an eight hour day, only noting that while Plaintiff could perform a job that required sitting, it needed to be flexible.  The April 2007 opinion is a more refined analysis of the issue based upon specific questions about the length of time that Plaintiff could sit and stand during an 8-hour workday.  Moreover, this issue was not raised by the ALJ. Accordingly, this is an improper post hoc argument.

In rejecting Dr. Ashe's physical assessment, the ALJ chose to give "great weight" to the opinions of consultative evaluator Dr. Elsner, who opined that Plaintiff "was certainly able to work while sitting."  (Tr. 31, 159.)  The ALJ stated as the basis for this that "Dr. Elsner's opinions were expressed before the claimant saw improvement through his treatment with Dr. Striebich and it would be expected that the claimant was even more capable of performing work after his physical improvement."  (*Id.*)  The ALJ also found that Dr. Elsner's assessment "is supported by the opinions of [Dr. Ashe] as expressed in his [sic] 'To Whom It May Concern' Letter of September 5, 2006 (Exhibit 8F), where [s]he opined seated work would be appropriate."  (*Id.*)

I find that the ALJ erred in relying on the consultative examination of Dr. Elsner to constitute substantial evidence in support of his physical RFC assessment and to reject

the opinions of Dr. Ashe.  First,  Dr. Elsner's opinion is not necessarily inconsistent with Dr. Ashe's opinions.  Dr. Elsner found that Plaintiff "is at risk for flares", and that "during flares of his gout, the affected joint will not be able to be used." (*Id.* 159.)  This is similar to Dr. Ashe's opinion in September 2006 that Plaintiff could perform work while sitting if it was "flexible enough to accommodate flare-ups of the above conditions." (*Id.* at 191.)

Second, Dr. Elsner offered no opinion about the functional effects of Plaintiff's obesity, either singularly or in combination with her other impairments.  While the doctor mentioned obesity as a problem, particularly in regards to Plaintiff's cardiovascular health and joints, she did not actually discuss what impact it had on same.  (Tr. 159.) Importantly, at the time of Dr. Elsner's evaluation of Plaintiff in April 2006 he weighed only weighed 203 pounds.  (*Id.* 157.)  Dr. Elsner stated Plaintiff had indicated that he lost ninety pounds over the past year, and used to weigh more than 300 pounds.  (*Id.*) Thus, she references only a "history" of morbid obesity, which was no longer the case at the time of the evaluation.  (*Id.*)  From this, it appears that Plaintiff's weight was under better control at that time.  The same was not true of the time period that Dr. Ashe offered her evaluations.

Indeed, Plaintiff's weight has ranged from 222 pounds when he was hospitalized in December 2005 (Tr. 152) to as high as 365 pounds on April 26, 2007 with a BMI of 57.16.  (*Id.* 204-05.)  As noted previously, in April 2007 Dr. Ashe discussed the vicious cycle of weight gain, joint stress, gout and prednisone.  (*Id.* 205, *see also* 267.) Dr. Elsner did not have the benefit of Dr. Ashe's opinions when she issued her opinion, and it is impossible to know whether she would have agreed with Dr. Ashe's opinions

rendered at a later time when Plaintiff again weighed over 300 pounds. Dr. Elsner also had not yet reviewed the EKG results that were pending (*id.* 158, 161) and her examination was before the subsequent cardiac testing and diagnosis of pulmonary problems. Given the foregoing, the ALJ's reliance on her evaluation as being inconsistent with that of Dr. Ashe was improper.

The ALJ also stated that he gave "some weight to the opinion expressed by the State Agency Reviewing Physician but finds the record to support greater limitations on standing and walking, secondary to gout and obesity than opined by the State Agency Physician." (Tr. 28.) Presumably the ALJ is referring to the Medical Source Statement completed by Dr. Chambers in November 2007. (*Id.* 259-266.)[6] Again, I find that the ALJ erred in connection with his analysis of Dr. Chambers' opinion.

First, the opinion of Dr. Chambers was obtained after all but the final of Dr. Ashe's opinions. "Ordinarily, development [of the record through consulting a medical expert] should not be undertaken for the purpose of deciding if the [treating physicians'] opinion should be given controlling weight if the record is otherwise adequately developed." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). In other words, it is improper to seek the opinion of a medical consultant merely to create inconsistent evidence. This opinion should thus not have been considered to determine whether Dr. Ashe's opinions were entitled to controlling weight.

---

[6] The State Agency Decision giving Dr. Elsner's opinion "great weight" as it was "fairly well supported by the objective evidence" (Tr. 122) was made by a Single Decision Maker (*id.* 123). As such., it was not a medical report that could be relied on by the ALJ. *See Beebe v. Astrue*, No. 09-cv-01834-ZLW, 2010 WL 4684025, at *7 (D. Colo. 2010) (citing 20 C.F.R. § 416.1406).

Second, while the ALJ stated that he gave "some weight" to the opinion, he does not explain what portion of the opinion he gave weight to which makes review impossible.  Third, Dr. Chambers' explanation of his decision talks only of Plaintiff's gout and the fact that there were no significant obstructive lesions in the heart.  (Tr. 266.)  As with Dr. Elsner, his report fails to show that he considered the full combination of impairments, including obesity.  Indeed, the instruction for completion of the form completed by Dr. Chambers states that a claimant's "body habitus" should not be considered .  (*Id.* 259.)[7]  Moreover, Dr. Chambers does not refer to or state that he considered the effects of obesity or other impairments such as depression.

Finally and importantly, Dr. Chambers' stated reasons for not giving treating physician Dr. Ashe's opinions full weight were not supported by substantial evidence. He first states that the treating physician's opinions "were based on findings prior to regular adherence to meds."  (Tr. 266.)  However, as discussed previously, there was substantial evidence in the record that Plaintiff continued to suffer from gout, pain and other problems even after adherence to medications.  Dr. Chambers also incorrectly stated that there had been no documented acute gout attacks since August of 2006.

I now turn to Dr. Ashe's opinions regarding mental capacity.  The ALJ gave give "no weight" to these opinions because Dr. Ashe "is not a mental health expert."  (Tr. 26.) The ALJ also found that "there is no evidence in the record to support that the claimant has any extreme, marked, or moderate mental limitations", and that Plaintiff's "treatment

---

[7] "Body habitus" is defined as "[t]he physique or body build."  http://www.medterms.com/script/main/art.asp?articlekey=21671.

has been minimal and he has had no psychological testing or evaluation." (*Id.*)  The

ALJ concluded that "the clinical notes of Dr. Ashe do not corroborate the limits [s]he

ascribes to claimant.  The mere existence of depression does not support the limits."

(*Id.*)  Again, these are not valid reasons to simply reject Dr. Ashe's opinions.

      First, the fact that Dr. Ashe is not a mental health expert is not a factor to be used

in determining whether to give the opinion controlling weight.  That issue is only relevant

if a decision is not given controlling weight.  Second, Dr. Ashe's opinion is not based on

the "mere existence of depression."  Instead, Dr. Ashe was asked to assess "how the

individual's mental/emotional capabilities are affected by *any impairment* you have

diagnosed." (Tr. 193.)  Dr. Ashe's assessment was thus based on the combination of

the many impairments that she diagnosed, not just depression.  Further, to the extent

that Dr. Ashe's opinions were based on Plaintiff's physical impairments, the fact that she

is not a mental health expert is not even particularly relevant.

      As to the finding that Dr. Ashe's opinions regarding Plaintiff's mental functional

capacity are not corroborated by her notes, an exam note in December 2005 indicated

that Plaintiff had sadness, anhedomia, difficulty concentrating, fatigue, thoughts of death

but without suicidal ideation.  Dr. Ashe diagnosed depression and prescribed Zoloft.

(Tr. 152.)  Another note states "patient with significant depressive symptoms." (*Id.* 205.)

More importantly, there is no evidence that Dr. Ashe was asked in her notes to make

functional findings as to how Plaintiff's mental conditions impacted his ability to work.

Thus, the absence of such findings does not justify simply discounting these opinions.

This is especially true as Dr. Ashe, as treating physician, was in a unique perspective to

determine how Plaintiff's impairments, in combination, impacted his functional capacity. She was also the only examining doctor that rendered such an assessment.[8]

Finally, the ALJ failed to show what evidence he relied on in the record to support his RFC finding. He did find that Plaintiff had mild difficulties in daily living, maintaining social functioning, and in maintaining concentration, persistence and pace. (Tr. 20.) These appear to have been documented by a non-examining mental health expert who completed a Psychiatric Review Technique form filled out on April 19, 2006 (*id.* 124-37), although the ALJ fails to note this in his decision or assign any weight to this decision.[9] Despite specifically finding that these difficulties existed, the ALJ erred in failing to include those limitations in the RFC or in the hypothetical question.

Instead, the ALJ opined that Plaintiff "has the ability to understand, remember, and carry out those types of work instructions that can be learned in thirty to sixty days" and that "[h]e can only have occasional work interaction with the general public, supervisors, and co-workers." (Tr. 21.) The ALJ erred as to this portion of the RFC because he did not state what evidence supported these findings as required by the

---

[8] Also, the finding that Plaintiff had no psychological testing or evaluation ignores the testing done by Dr. Elsner. Dr. Elsner found the general fund of knowledge by Plaintiff and judgment to be appropriate, but found some problems with "serial 7's." (Tr. 158-59.) The regulations state that "[o]n mental status examinations, concentration is assessed by tasks, such as having you subtract serial sevens or serial threes from 100." 20 C.F.R. 404, Subpart P, App. 1, 12.00 Mental Disorders (C)(3). This finding could thus be construed to lend some support to a finding of difficulties in concentration.

[9] This form is a "check-the-box" form that does not appear to be supported by a "thorough" written report. Thus, it is doubtful this form could be substantial evidence in support of the ALJ's decision. *Baker v. Barnhart*, No. 03-7041, 2003 WL 22905238, at *3 (10th Cir. 2003) (a few handwritten notes from the medical evidence and a statement that the assessment is based on the medical evidence does not constitute a "thorough explanation" and the RFC assessment thus does not constitute substantial evidence to support the ALJ's finding).

law.  *See* SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996); *see also Moon v. Barnhart*,

No. 04-7130, 2005 WL 3446576, at *2-3 (10th Cir. Dec. 16, 2005) (remanding the case

where "the ALJ never specified what he believed the credible medical evidence to be,

either for the purpose of rejecting the doctors' RFC assessments or for the purpose of

supporting his own finding" and where the court was thus unable to determine what

evidence the ALJ relied on in connection with the RFC).

Indeed, I have found no evidence in the record that supports the ALJ's mental

RFC finding.  If the RFC was meant to encompass the mental limitations the ALJ found,

it does not and is deficient.  *See Young v. Barnhart*, 362 F.3d 995, 1004 (10th Cir. 2004)

(hypothetical question which asked the VE to assume that a claimant of Young's age,

education, and work experience could perform only "simple, routine, repetitive, low

stress work with limited contact with coworkers and limited contact with the public" failed

to include all of the limitations supported by the medical evidence, including impairments

in social judgment and in concentration, learning, and interacting with others); *Craft v.*

*Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008) (limiting hypothetical question to simple,

unskilled work does not account for claimant's difficulty with memory, concentration, or

mood swings).

Also on remand, since there was evidence of a mental impairment that allegedly

prevented Plaintiff from working—depression, a severe impairment as found by the ALJ

(Tr. 19)—the ALJ is "required to follow the procedure for evaluating the potential mental

impairment set forth in [the] regulations and to document the procedure accordingly."

*Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1048 (10th Cir .1993).  The

ALJ must make a functional assessment of Plaintiff's mental RFC, stated in vocationally relevant terms.  The ALJ may also need to obtain a consultative mental exam, as there is no evidence in the record to support his RFC.  This is particularly true given the ALJ's findings of mild difficulties in some areas, including maintaining attention, concentration and pace.  Even a mild limitation in those areas can be significant as to the production pace jobs the ALJ found were available to Plaintiff.  By DOT definition, those jobs involve "constant" use of the hands for pushing or pulling materials.  *See Ramirez v. Barnhart,* 372 F.3d 546, 554 (3rd Cir. 2004) (the hypothetical question to the VE "must account for documented limitations of concentration, persistence or pace."); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003) (same).

In conclusion, I find that a remand is required so that the medical evidence from treating physician Dr. Ashe and the other medical providers can be properly weighed. On remand, the ALJ must consider whether to give Dr. Ashe's opinions controlling weight.  If her opinions are not given controlling weight, the ALJ must give deference to the opinions, examine the appropriate factors and determine what lesser weight her opinions should be given.  If the ALJ believes the evidence from Dr. Ashe is incomplete in any area, the ALJ should go back to the treating physician and make inquiry rather than make an improper lay judgment.[10]  The ALJ must also conduct a proper RFC evaluation, both mental and physical.

---

[10]   Apparently this is what the ALJ was purporting to do with his letter to Dr. Ashe.  (Tr. 109-110.) However, the ALJ did not state his specific concerns to the doctor, such as whether or not Dr. Ashe considered the allegations of improvement with medication and her ability to opine regarding mental functional capacity when she is not a mental health expert.

3.      The ALJ's Step Three Analysis

Since I am remanding the case to the Commissioner for the proper weighing of

the medical evidence in this case, including treating physician Dr. Ashe's opinions, this

will obviously require a new step three analysis.  On remand, the ALJ must reconsider

whether Listing 1.02 is met based on all the medical evidence.  This includes an

analysis of Plaintiff's ability to ambulate effectively given his combination of impairments

and pain.  The ALJ made no findings in his decision on this issue despite the fact that

the ALJ found that Plaintiff's ability to walk was such that he could stand and walk 10

minutes per occasion for up to a total of 2 hours in an 8 hour day.  (Tr. 20.) The

evidence also shows that Dr. Ashe opined that Plaintiff's ability to stand and walk is

limited to less than one hour (*id.* 191), and prescribed a wheelchair for bad days, and

that Plaintiff needs help to put on his socks and shoes.  (*Id.* 90.)

Further, obesity may be a factor in the "meets" and "equals" determinations.

SSR 02-1p, 2000 WL 628049, at *5.  "An individual with obesity 'meets' the

requirements of a listing if he or she has another impairment that, by itself, meets the

requirements of a listing."  *Id.*  A listing is also met "if there is an impairment that, in

combination with obesity, meets the requirements of a listing."  *Id.*  The listing states:

> For example, obesity may increase the severity of coexisting or related
> impairments to the extent that the combination of impairments meets the
> requirements of a listing. This is especially true of musculoskeletal,
> respiratory, and cardiovascular impairments.  It may also be true for other
> coexisting or related impairments, including mental disorders.

*Id.*  Obesity, by itself, may also be medically equivalent to a listed impairment.  *Id.*

tings). "For example, if the obesity is of such a level that it results in an inability to

-29-

ambulate effectively, as defined in sections 1.00B2b or 101.00B2b of the listings, it may substitute for the major dysfunction of a joint(s) due to any cause (and its associated criteria), with the involvement of one major peripheral weight-bearing joint in listings 1.02A or 101.02A", and a finding of medical equivalence will be made. *Id.*

Finally, section Q of Listing 1.00 requires the ALJ to consider obesity and the combined effects of obesity with musculoskeletal impairments in determining whether or not the listing is met or equaled.  The ALJ referenced Listing 1.00 but does not discuss obesity in connection with same.  If the ALJ is not able to make a determination from the medical evidence as to whether or not Plaintiff's impairments or combination of impairments meet or equal the listings, he should use the services of a medical advisor.

### 4.      The Validity of the Hypothetical Question

I previously found that the ALJ erred in not including all of Plaintiff's limitations in the hypothetical question.  This also requires a remand, since testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments does not constitute substantial evidence to support the ALJ's decision.  *Gay v. Sullivan*, 986 F.2d 1336, 1340 (10th Cir. 1993).

Further, since the medical evidence must be reweighed, including the opinions of Dr. Ashe, the hypothetical question will need to include all impairments in the medical evidence that are supported and given weight.

### 5.      Whether the ALJ Erred in his Credibility Findings

I also find that the ALJ's analysis of the credibility of Plaintiff and of the third party witnesses does not comport with the legal relevant standards and must be reassessed

on remand.  I previously found that the ALJ did not conduct a proper pain analysis and that the ALJ erred in connection with findings that he made regarding Plaintiff's failure to take medications and to find a treating physician for a few months after moving to Colorado.  I also found errors with the ALJ's assessment that Plaintiff was at a low risk of a gout flare-up as indicated by Dr. Striebich.  The ALJ culled the evidence looking only at evidence of improvement in gout without considering all impairments, and failed to allow Plaintiff to explain the alleged failure to get treatment.  I now find other errors with the credibility analysis that require a remand of the case.

I first note that an ALJ's credibility determinations must be "closely associated and affirmatively linked to substantial evidence on the record. . . ."  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995).  "Culling isolated bits of evidence from the record to support a preconceived notion will not satisfy the 'substantial evidence' standard." *Stewart v. Chater*, 993 F. Supp. 809, 814 (D. Colo. 1998).  "Proper review requires a 'meticulous' examination of the record in its entirety."  *Id.* (citing *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)).

In this case, the ALJ also found Plaintiff not to be credible based on the fact that he denied that he had told emergency room staff, on one occasion, that he had smoked methamphetamine as reported in the record.  Plaintiff testified that he had been trying to correct the record on that issue, unsuccessfully.  The ALJ obviously chose to believe the information contained in the medical records despite Plaintiff's testimony.  However, the ALJ does not make it clear why that discrepancy in the testimony is significant as to whether or not the rest of Plaintiff's testimony is credible.  The ALJ is ignoring the

objective medical evidence that documents a number of medical impairments that significantly impact Plaintiff, and concentrating on extraneous issues to discredit Plaintiff's testimony.  This is improper.  *See McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (an ALJ's credibility judgments "by themselves 'do not carry the day and override the medical opinion of a treating physician that is supported by the record'") (quotation omitted).  Further, there is no reference anywhere else in the record to the use of illegal substances, and there is no evidence that smoking methamphetamine would increase gout symptoms.

The ALJ also ignored the fact that the Social Security interviewer who did a face-to-face interview with Plaintiff noted that he had trouble standing and walking and observed that "[h]e was on crutches and wore house shoes."  (Tr. 70)  SSR 96-7p states that "[t]he adjudicator must also consider any observations of the individual recorded by Social Security Administration (SSA) employees during interviews whether in person or by telephone".  *Id.*, 1996 WL 374184, at *8.

Further and importantly, the ALJ also failed to properly consider the third-party opinions.  Third parties provided statements that Plaintiff had a problem with exertion and with pain.  Phillip Stockard talks about the fact that there is a low point of "being unable to stand, or walk, due to severe joint pain and shortness of breath."  (Tr. 112.)  He goes on to summarize that his observations are that Plaintiff is "unable to report to work in a timely, dependable manner. . . ."  (*Id.*)

Deborah Robinson states she "watched the quality of [Plaintiff's] life diminish due to health issues."  (Tr. 113.)  She asserts that Plaintiff "now has limited mobility due to

his decreased respiratory capacity and is in constant physical pain from gout.  Basically, he no longer has the energy, strength, nor endurance to work to support his family. . . ." (*Id.*)  She also discusses the issue of self-esteem, and notes the huge weight fluctuations that aggravate the gout and make his breathing even more difficult.  (*Id.*)

June Gagnon stated, "I have watched his health deteriorate to a point where he can barely function on a day-to-day basis."  (Tr. 114.)  She talks about "most days, swelling and pain in his joints and limbs prevent him from walking, standing, or even sitting comfortably; it is no longer possible for him to even wear shoes."  (*Id.*)

Janet Umbrech notes how Plaintiff's "health has faded so much, he doesn't even seem like the same person."  (Tr. 115.)  She states, "it is almost impossible for him to get out of the bed in the morning; he can no longer wear shoes and it is difficult to find clothing, to fit him, because of the swelling in his joints and limbs.  Just walking the length of my sidewalk, to the house, leaves him breathless."  (*Id.*)

The ALJ summarily rejected these opinions, stating "while I'm sure their statements of observations are heartfelt, the content is not fully supported by the medical evidence and the statements regarding the cause of Claimant's medical problems are beyond the expertise of the letter writers.  Whether the Claimant is able to perform work is an opinion left to the Commissioner."  (Tr. 29.)  This was improper. First, most of the opinions given by these witnesses are not beyond the expertise of the writers.  They are observations of Plaintiff's symptoms and his ability to ambulate.  As such, they cannot be discounted as opinions left to the Commissioner.  Moreover, while the ALJ states that the content of the letters is not fully supported by the medical

evidence, he does not explain this statement and there is clearly substantial medical evidence in the record documenting many of these symptoms.

The Social Security Rulings make clear that information from such sources "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03p, 2006 WL 2329939 at *2 (Aug. 9, 2006); *see also Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) ("[W]e have held that friends and family members in a position to observe a claim of symptoms and daily activities are competent to testify as to his condition.")  As to such sources, "it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and other factors that tend to support or refute the evidence."  *Id.* at *6. Further, the ALJ should explain the weight given to these other sources, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an affect on the outcome of the case."  *Id.*  The ALJ erred as he did not properly consider the observations of these witnesses and did not provide legitimate reasons to reject these opinions in their entirety.

In summary, I agree with Plaintiff that the ALJ did not discuss information critical to a proper and fair determination, did not link his findings closely and affirmatively to substantial evidence, failed to properly consider the opinions of lay witnesses, and failed to properly explain his decision as required by relevant Social Security Rulings.  The case is remanded for a proper analysis of Plaintiff's and the third parties' credibility.

6.      The ALJ's Step Five Analysis

The ALJ used the Medical Vocational Guidelines to determine that Plaintiff was

not disabled, stating that if he were limited to the full range of sedentary work, a finding

of not disabled would be directed by medical vocational rule 201.28.  (Tr. 32.)  The

Guidelines provide that in situations involving an impairment or combination of

impairments resulting in both strength limitations and non-exertional limitations, the

medical vocational rules can be used as a framework for consideration of how much the

individual's work capacity is further diminished in terms of any types of jobs that would

be contraindicated by the non-exertional limitations.  The ALJ acknowledged that

Plaintiff's "ability to perform all or substantially all of the requirements of this level of

work has been impeded by additional limitations", and asked for the testimony of a

vocational expert ["VE"] "to determine the extent to which these limitations erode the

unskilled sedentary occupational base."  (Tr. 32.)

The VE testified that an individual with Plaintiff's RFC could not perform Plaintiff's

past work, but could perform the unskilled sedentary jobs of telephone quotation clerk

(DOT 237.367-046, with a Specific Vocational Preparation ("SVP") of two, 1,785 jobs in

Colorado, and 93,800 jobs nationally) and document preparer (DOT 249.587-018, with

an SVP of two, 460 jobs in Colorado, and 33,165 jobs nationally). (Tr. 326.)  In addition,

the VE testified that Plaintiff could perform the unskilled light jobs listed at Census Code

896, which she classified as light because of a production pace and not because of

standing.  (Id.)  Representative examples of Census Code 896 jobs according to the VE

were production assembler (DOT 706.687-010) and bench assembler (DOT 706.684-042).  (*Id.* 326, 33.)

As to the job of telephone quotation clerk (DOT #237.367-046), the VE found that Plaintiff could perform this job in response to the first hypothetical question.  However, the ALJ then added to that hypothetical a limitation of only occasional work interaction with co-workers, the public, or supervisors.  (Tr. 327.)  The  VE testified that would eliminate the telephone quotation clerk job.  (*Id.*) Nonetheless, the ALJ found that Plaintiff could perform this job.  This was clear error, as even the Commissioner acknowledges, given the VE's testimony.  (Def.'s Resp. at 34.)

The Commissioner argues, however, that this error was harmless because it does not affect the outcome of the case.  The Commissioner first asserts that while this job "technically should have been eliminated due to the vocational expert's testimony, the ALJ only included a limitation to occasional contact with supervisors, co-workers, and the public to give Plaintiff 'every benefit of the doubt' (Tr. 19)."  (Def.'s Resp. at 34.) The Commissioner further states that "[t]here is no indication in the record that Plaintiff actually had problems dealing with others; in fact, he reported social activities like getting together with family on a weekly basis (Tr. 93)." *Id.*  These arguments are without merit.  Regardless of whether the ALJ gave Plaintiff "every benefit of the doubt", the ALJ nonetheless found as part of the RFC that Plaintiff was limited to jobs with occasional contact with supervisors, co-workers, and the public.  Accordingly, it had to be included in the hypothetical question, and the VE made clear that this limitation

precluded the telephone quotation clerk job.  Thus, this job should have been eliminated from the ALJ's consideration at step five.

The Commissioner also argues that the ALJ's error was harmless because the ALJ identified other jobs that constitute a significant number of jobs Plaintiff could perform even if the telephone quotation clerk job was eliminated.  I find as addressed below that a remand is required on this issue.

I first address the unskilled light jobs listed at Census Code 896 that the ALJ found Plaintiff could perform based on the VE's testimony.  The VE said that there were approximately 3,300 such jobs in Colorado and 356,000 nationally.  She testified that these numbers were "eroded" by 50% because some of the jobs would require more standing than Plaintiff's RFC called for.  (Tr. 326).  Thus, by implication, the VE's testimony was that Plaintiff could not perform at least half of the light occupations under Census Code 896 (comprising approximately 416 light unskilled occupations).

I first find that the VE did not adequately explain how she reached her conclusion that the number of jobs in Census Code 896 was eroded by 50% "to adjust out for the jobs that would involve more standing."  (Tr. 326.)  There was no testimony to show how the VE arrived at that 50% figure–whether it came from publications, from the VE's actual experience in placing people on jobs, from employment surveys, or whether it was merely a guess.  "Evidence is not substantial if it . . . constitutes mere conclusion." *Musgrave*, 966 F.2d at 1374.  If there was a basis for the VE's testimony, the ALJ had the ". . . burden to thoroughly develop" that evidence at step five.  *Haddock v. Apfel*, 196 F.3d 1084, 1089 (10th Cir. 1999).  This must be addressed on remand.

Second, I find that VE erred by opining only as to the number of jobs within the entire census code that a hypothetical person with Plaintiff's RFC could do and not providing numbers of jobs as to the two "representative" jobs within the code that she found Plaintiff could perform–production assembler and bench assembler.  Further, as it appears that the VE felt that Plaintiff could perform additional jobs within the census code, she did not state what those jobs were or how many of such jobs existed. Accordingly, the VE's testimony on this issue does not constitute substantial evidence that a significant number of those jobs existed in the local or national economy.  *See Haddock*, 196 F.3d at 1088 ("[*i*]*dentified jobs* must be shown to exist in 'significant numbers' in the regional or national economies") (emphasis added); *St. Pierre v. Astrue*, No. 10-cv-104-JAW, 2010 WL 5465635, at *2-3 (D. Me. Dec. 29, 2010) (ALJ erred in relying on vocational testimony that plaintiff could perform 3 representative jobs within a census code for occupational grouping, where there was no evidence as to numbers of the individual jobs, only the entire census code; vocational testimony did not "constitute substantial evidence that the three specific jobs at issue existed in significant numbers in the regional economy").  This also requires a remand.

I also note on the issue of the census code jobs that the DOT says certain jobs are classified as light ". . . when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of these materials is negligible."  (Pl.'s Opening Brief, Ex. C.)  As to such light jobs, the DOT states "the constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even

though the amount of force exerted is negligible." *Id.* Given the fact that I ordered the ALJ on remand to consider whether Plaintiff can perform at a production pace given his limitations in concentration, attention and pace and other impairments, this may also impact the number of jobs that Plaintiff can do within this category and must be adequately addressed on remand.

The ALJ must also consider whether Plaintiff's limitation to no more than frequent reaching, handling, fingering or feeling impacts Plaintiff's ability to perform jobs under this census code "since sometimes those jobs might have [such] constant or continuous" [requirements].   (Tr. 327) (emphasis added).   Indeed, Plaintiff points out that some of the occupations in the census code involve constant use of the hands in handling and fingering.   While the VE was asked about this and said there would not be any further erosion (*id.*), this was not adequately explained as it appeared to conflict with the DOT.   This must be corrected on remand. *Smith v. Barnhart*, No. 04-7027, 2006 WL 467958, at *3 (10th Cir. Feb. 28, 2006) ("'before an ALJ may rely on expert vocational evidence as substantial evidence to support a determination of nondisability, the ALJ must ask the expert how his or her testimony as to the exertional requirement of identified jobs corresponds with the [DOT], and elicit a reasonable explanation for any discrepancy on this point'") (quoting *Haddock*, 196 F.3d at 1087).[11]

Finally, I turn to the only other job the ALJ found Plaintiff could do, the sedentary job of document preparation clerk.   The VE testified and the ALJ found that there are

---

[11]   The ALJ should also inquire whether the fact that jobs classified as "light" because of a production pace involving constant use of the hands in regard to pushing and pulling conflicts with Plaintiff's RFC.

460 document preparer jobs in Colorado and 33,165 nationally.  (Tr. 326, 32-33.)  The Commissioner argues that even without the other jobs in the light category, this constitutes a significant number of jobs.  I disagree.

The Tenth Circuit "has never drawn a bright line establishing the number of jobs necessary to constitute a 'significant number'".  *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992).  Nevertheless, the Tenth Circuit has found that when the number of jobs is 650 to 900 statewide or less, "such a number was small enough to put the issue in a gray area requiring the [ALJ] to address" whether the number is significant under the *Triamar* factors.  *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004).  The ALJ made no finding that the jobs for document preparation clerk, by itself, constituted a significant number of jobs.  On remand, if this is the only job that Plaintiff is found to be able to perform, the ALJ must determine whether this number of jobs is "significant", considering many factors such as "the level of Claimant's disability; the reliability of the VE's testimony; the distance the claimant is capable of traveling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on."  *Trimiar*, 357 F.3d at 1145.

### 7.   The Appropriate Remedy

Plaintiff argues that an outright reversal is required.  Reversal and remand for immediate award of benefits is appropriate when "the record fully supports a determination that Plaintiff is disabled as a matter of law and is entitled to the benefits for which he applied."  *Sorenson v. Bowen*, 888 F.2d 706, 713 (10th Cir. 1989)

(quotations omitted).  In this case, further fact finding is necessary and the case is remanded to the Commissioner on that basis.

III.    <u>CONCLUSION</u>

Based upon the errors described above, it is

ORDERED that this case is **REVERSED AND REMANDED** to the Commissioner for further fact finding pursuant to sentence four in 42 U.S.C. § 405(g).

Dated:  March 28, 2011

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge